## INSKEEP v. INSKEEP.

Adultery being peculiarly a crime of darkness and secrecy, in proceedings for a divorce on the ground of adultery, it is not necessary to prove the direct act.

The criminal intercourse may be established by, or infered from, circumstances, which circumstances should lead to the adultery, by fair inference, as a necessary consequence.

The circumstances must be such as would lead the guarded discretion of a reasonable and just man, to the conclusion of adultery.

In order to establish adultery, such proximate circumstances must be proved, as by former decisions, or in their own nature and tendency, satisfy the legal conviction of the court, that the criminal act has been committed.

The circumstances are to be taken together, and when combined, must tend to establish, the criminal disposition of the party charged—a like disposition of the alleged *particeps criminis*—and the opportunity to commit the act.

Where the facts or circumstances relied upon to establish the adultery, are capable of two interpretations, one of which is consistent with the innocence of the party charged, they will not be sufficient to establish guilt.

If the facts proved, cannot be reasonably reconciled with the assumption of innocence, but are harmonious with the assumption guilt, the court may infer such guilt.

Inskeep v. Inskeep.

Under section 1482 of the Code, which provides that a divorce may be decreed, where the parties cannot live in peace and happiness together, the chancellor must be fully satisfied that the facts charged in this respect, are true, and that the moral, social and mental welfare of the parties and their children, requires a separation.

The law contemplates and requires a cause, or a state of facts justifying a divorce, and the court is to judge whether the proof under such a charge, is such as forfeits the marriage contract.

The power conferred upon the court in such cases, is not the exercise of a discretion arbitrary in its character, but it must be exercised in a sound and legal manner.

Section 1482 of the Code, does not have reference to the temporary peace and happiness of the parties, nor to their temporary welfare, but it was designed by the legislature, that the chancellor should have regard to their permanent—their general—peace, happiness and welfare.

Under section 1482 of the Code, a divorce is not to be decreed to the wrong doer.

If it shall appear that the parties could live together in peace and happiness, but for the unwarrantable conduct of complainant, the relief prayed for, should be denied; but if the respondent is the guilty party, and the complainant the innocent one, the divorce should be granted.

So, there may cases arise under the law, where the parties are mutually at fault, in which a divorce might be decreed.

Where a petition for a divorce on the ground of adultery, was filed on the 2d day of January, 1855, and was amended on the 25th of the same month, by charging that on account of the facts stated in the bill, and of others which have transpired since the filing of the same, the parties cannot live in peace and happiness together, and that their welfare requires their separation, for which cause, under the law then in force, the complainant was entitled to a·divorce *a vinculo matrimonii;* and where, on the 24th of January, 1855, the legislature passed,an act amending the law in relation to divorce, by which a divorce *a mensa et thoro* only was allowed for such cause, which act did not take effect until the first day of July, 1855; *Held,* That the case was saved, under section 26 of the Code, and that complainant was entitled to an absolute divorce.

The act of January 24, 1855, entitled "an act to amend the law in relation to divorce and alimony," did not repeal section 26 of the Code, which provides that the repeal of a statute, shall not affect any proceeding commenced under or by virtue of a statute repealed.

In cases of divorce, under section 1485 of the Code, the court may give the wife, a portion of the husband's property, either real or personal, absolutely, and in her own right.

But this should not be done, if the husband is in a condition to pay money, unless there is something in the situation of the wife, which

would render it equitable and just to give her the property, in the place of money.

### Appeal from the Wappello District Court.

#### FRIDAY, SEPTEMBER 11.

These parties were married in the State of Ohio, in the year 1817, and continued to reside there until the spring of 1849, when they removed to Wappello county in this state, where they have had their domicil to this time. In December, 1854, they separated, and on the 2d of the succeeding month of January, she filed her petition for divorce and alimony. From this petition, we learn that at said date, the number of children born to said parties, and then living, were five, two of them being married and settled in life, and the youngest, a daughter being about six_ teen years of age. Complainant charges that in a few years after their marriage, the respondent manifested at times, a violent and ungovernable temper, and often treated her disrespectfully, and as she had reason to believe, sought the society of other women, and formed with them improper intimacies. She also charges, that after their removal to this state, his conduct towards her became worse, and his sallies of passion and violent language more frequent, and that for three years prior, she had reason to suspect that he had been guilty of adultery, with divers women, living on his premises and elsewhere. The bill then charges expressly, that in the spring and summer of 1854, while petitioner was absent to Ohio, on a visit to her friends, respondent was guilty of repeated acts of adultery, with one Eliza Omick. It is also averred that his property is of the value of about sixteen thousand dollars; that she is aged fifty-seven years; and that she, with their youngest daughter, was compelled to leave the homestead, and find a home with her son-in-law, on account of the violent and abusive language and conduct of said respondent towards her. On the 25th of January, 1855, complainant, by leave

Inskeep v. Inskeep.

of court, amended her petition, alleging that "on account and by reason of the matters and things set forth and contained in her said petition, and matters transpired since the filing of the same, she and the said defendant cannot live in peace and harmony together, and that their welfare requires their separation."

The answer denies the adultery, and all of the material allegations contained in the petition, which charges improper conduct upon respondent. The averment made in the amendment to the original petition, is not denied in express terms, but the answer charges in effect, that if they cannot live in peace and happiness together, the cause is attributable to said complainant, and her unhappy disposition, and violent and ungovernable temper, and not to any fault of the respondent. To this answer, there was a replication, substantially reaffirming the matters stated in the petition, and denying all charges of improper conduct, made by respondent against complainant, in his said answer. The cause was heard on these pleadings, and the testimony of a great number of witnesses, now before the court in the form of depositions, covering some two hundred pages. The court below found that the charge of adultery was not sustained; that the parties could not live together in peace and happiness, and that their welfare required their separation, and thereupon decreed that the bonds of matrimony existing between said parties be dissolved—that complainant assume her maiden name of Elizabeth Ambrose, and that she have as alimony, certain property and money, amounting to about the sum of five thousand dollars — the property consisting of certain lots in the town of Otumwa, which are decreed to her absolutely, and the money by said decree, being required to be paid in installments, the last payment becoming due July 1st, 1861. The portion of the testimony and record, material to the more full understanding of the points decided, will be found refered to in the opinion of the court.

Respondent appeals.

*S. W. Summers* and *J. C. Hall*, for the appellant.

*Knapp, Caldwell & Wright*, for the appellee.

WRIGHT, C. J.—The questions presented by counsel for the respective parties, for our determination, are substantially as follows :

1.  Is the charge of adultery sustained by the proof?

2.  If not, is complainant entitled to a divorce, for the reason that she and respondent cannot live in peace and happiness together, and that their welfare requires a separation ?

3.  If a divorce shall be decreed for this last cause, shall it be a *vinculo* or a *mena et thora ?*   And

4.  If she is entitled to a divorce for either cause, and in either form, is the decree for alimony as made by the court below, correct?

These questions we shall proceed to respond tot as near in the order presented, as may be necessary to the proper disposition of the cause.

In determining the first question, it may not be improper to refer, very briefly, to some of the rules of evidence which should govern its examination.   And all the cases agree in holding that, this being peculiarly a crime of darkness and secresy, it is not necessary to prove the direct fact of adultery, for, if so, there is not one case in a thousand, in which the proof would be attainable.   In almost every instance, therefore, the criminal intercourse is established, or may be infered, from circumstances—which circumstances, however, should lead to it by a fair inference, as a necessary consequence.   What circumstances will lead to such a conclusion, it is impossible to lay down universally, for they are infinitely diversified, and have more or less weight, dependent upon the peculiar character of each case.   The rule laid down by Lord Stowell, and subsequently uniformly recognized on this subject is, " that the circumstances must be such, as would lead the guarded discretion of a reasonable and just man to the conclusion, for it is

not to lead a rash and intemperate judgment, moving upon appearances, that are equally capable of two interpretations—neither is it to be a matter of artificial reasoning, judging from such things differently from what would strike the careful and cautious consideration of a discreet man. Upon such subjects the rational and legal interpretation must be the same. *Lovedon* v. *Lovedon*, 2 Hoggs. Cons. 1, (4 E. E. R., 461). And it was said by the same learned judge, in another case, "that there must be such "*proximate circumstances* proved, as by former decisions, "or in their own nature and tendency, satisfy the legal con- "viction of the court, that the criminal act has been com- "mitted." *Williams* v. *Williams*, 1. Hoggs. Cons., 299. In examining the proofs or these circumstances, they are not to be either detached or immolated, but the whole must be taken together, for they mutually interpret each other, and when combined, they may lead to the inference of guilt, or establish the innocence of the party charged, whereas, when taken separately, they might be entirely without meaning. *Burgess* v. *Burgess*, 4 E. E., 527; *Grant* v. *Grant*, 7 Ib. 3. In another case, it is said "that in every case of adultery three things must combine, and that when they do combine, the offence is almost as a matter of course, committed. Those are: 1. The criminal disposition or intent on the part of defendant; and, 2. The same in the alleged *particeps criminis*; and, 3. The opportunity. *Westmeath* v. *Westmeath*, 4 E. E., 238, and see *Bramwell* v. *Bramwell*, 5 Ib., 232. And in still another case, it is laid down, that when the facts relied upon are capable of two interpretations, one of which is consistent with the defendant's innocence, they will not be sufficient to establish guilt. *Fergurson* v. *Fergurson*, 3 Sandf., 307. But on the other hand, if the facts proved cannot be reasonably reconciled with the assumption of innocence, but are harmonious with the assumption of guilt, the court may infer such guilt. *Daily* v. *Same*, Wright 514: *Longstaff* v. *Same*, Ib. 148. Circumstances, however, that are merely suspicious, are not sufficient. *Johnston* v. *Johnston*, Ib. 454:

*Wood* v. *Wood*, 2 Paige, 108. In a majority of the cases, where the fact of adultery is established by circumstantial evidence, it will be found that such evidence assumes some definite form, or tends to establish the criminal act by the proof of those circumstances from which the mind reasonably and satisfactorily infers guilt. For instance, if the adulterous disposition of the parties is once established, the crime may be inferred from their afterwards being together under circumstances authorizing such inference. So, if the husband shall be found going into a brothel, this raises suspicion of adultery, which it is said can only be rebutted by the very best kind of evidence. And the fact that a woman has gone to such a place with a man, other than her husband, furnishes similar proof of adultery. And a Scotch writer has said that, "the ordinary pre-"sumptions are, the being oft alone together, gifts, love-"letters, close doors, the wife's being abroad all night *un-*"*das con nuda et solus com sola,* the entertaining persons "that are known to be pimps." Bishop on M. & D. section 434; 6 McKean Crim. Law, 177; 2 Greene Ev. section 44. And yet, in considering presumptions of this nature, and in every case, indeed, it is very important not to forget the peculiar character, situations and habits of the parties, as well as the habits and modes of education of the community in which they dwell. Bishop, section 439. And, finally, it may be said, that while it may be comparatively easy to pronounce with a reasonable degree of confidence, in those cases which are distinctly and broadly marked by circumstances, assuming some one of the forms above suggested, yet when in the language of Shaw, C. J., in *Dunham* v. *Dunham*, 6 Law Rep. 139, " these circum-" stances are wanting—when there has been no previous un-"warrantable or indecent intimacy between such parties ; no "clandestine correspondence, or stolen or secret interviews—" the fact of opportunity and equivocal appearances," should hardly be allowed to throw even a passing cloud of suspicion over either of the parties implicated.

Applying these general considerations or rules, to the

Inskeep v. Inskeep.

case before us, and after examining the entire testimony with the utmost care, we incline to the opinion that the first charge in the bill is not sustained, and that if a divorce is granted, it must be for the second cause therein contained. The charge in the bill is, that respondent committed adultery with one Eliza Omick.    There is no pretence for claiming that the evidence establishes the fact directly.    It is only claimed to be proved from circumstances.    And while some of these circumstances, we are free to admit, are quite consistent with an adulterous intention on the part of respondent, yet, we cannot think them sufficient to justify the conclusion that he has in fact been guilty as charged. There may have been, on his part, the criminal disposition, but there is nothing to satisfy'us of a like disposition or intention on the part of the alleged *particeps criminis.* There is scarcely a shadow of suspicion thrown upon her character for virtue and chastity, except such as is claimed to arise from her alleged intimacy with respondent.    It is not shown that she ever, on her part, sought his company or society—that she manifested any prediliction for him— that her affections for her husband had been in the least alienated—that she took any steps to conceal from her husband, or others, her meetings and associations with respondent—and, indeed, no act which may not be reasonably reconciled with the assumption of her entire innocence.    The respondent, at the time charged, was carrying on a large farm, Omick was his tenant, and his family lived in the same inclosure with that of respondent, and about twenty or thirty yards distant.    His hands boarded with Ormick, and this tenant had charge of the cows and stock upon the place.    It is shown that respondent would attend Mrs. Ormick when milking the cows, that at one time they were seen to come from the milk-house together; and that on two or three other occasions, they were seen close together conversing, but what was said is not shown. There is nothing to show, however, that these meetings were designed to be secret, nor that there was any effort to conceal the knowledge of them from other persons.

There is also some proof that one time, when Mrs. O. was sick, respondent was particularly attentive to her, gave her medicine and prepared her food.   At this time, his family was absent to Ohio, and he was boarding with this tenant. It was at a season of the year when the work upon the farm was very urgent, and when he would be likely to feel the most anxiety for her recovery, as she was boarding his hands, and her husband's labor was desired in the field as soon as he could be spared from the house.   Affection for her, as his paramour, may have, it is true, induced these kindnesses on the part of respondent, but interest, and a desire that she should, as soon as possible, be able to take care of the family, may also have influenced them, consistent with the utmost innocence on the part of each. And independent of any interested motives, it could tend but little, if any, to show a criminal intent, that at times he should have done those things which, perhaps, might more appropriately have been left to the female help or visitors.   Such conduct is, to our minds, quite as much in harmony with innocence, and a kind heart, as with guilt and a depraved mind.   So, there are other ciruumstances relied upon by complainant to show respondent's guilt, but without referring to them in detail, we dismiss this part of the case by saying, that while it may even be conceded, that such circumstances are not consistent with entire innocence of intention on his part, and might, indeed, be construed in harmony with the assumption of his actual guilt, yet that they may all be true, and reasonably reconciled with the supposition of his innocence.   Under such circumstances, we cannot say that his guilt is established.

We are then led to inquire whether the second ground relied upon by complainant, is sustained by the proof, to wit : that she and respondent cannot *live in peace and happiness together, and that their welfare requires a separation.* The code (ss. 1482) provides that a divorce from the bonds of matrimony may be decreed, when these things are made *fully apparent to the court.*   And in considering this provision, we remark, in the first place, that it must be made

Inskeep v. Inskeep.

fully apparent to the court, not only that the parties can not live in peace and happiness together, but also that their welfare requires their separation. As a general rule, it will doubtless be found, that if the parties to the marriage relation can not continue therein in peace and happiness, their welfare would be promoted by a separation. And especially is this true, if we give to the word welfare an extended, and not a limited signification. Their pecuniary welfare might be hazarded by decreeing a separation, even where there was the utmost discord, and the most positive unhappiness. But it is not in this sense alone, that we are to consider this term. While their welfare in this respect is to be regarded, yet it must not be forgotten that in this connection, the term has a higher and more important meaning. The court is to consider their moral, their social, and their mental well being. And not only theirs, but also the well being of their children. If young, and peculiarly dependent upon their nurture and care, the welfare of the children becomes, perhaps, the most important element in determining what would be for the welfare of the parents. Under such circumstances, it would be almost impossible to disconnect the welfare of the one from that of the other. And thus we might proceed at greater length to illustrate what, in our opinion, is meant by the word welfare, as used in this section. We pass it, however, with the further remark, that where there is not peace and happiness in this relation, (in the sense hereafter explained), the inference is fair and natural that the welfare of the parties will not be advanced by continuing the same. Peace and happiness are, in the marriage relation, so pre-eminently essential to the promotion of the welfare of the parties thereto, that it is quite difficult to conceive of the one without the other. And yet there may be cases, where the court would be satisfied that the parties could not live in peace and happiness together, and at the same time, it might not be apparent that their welfare required their separation. But, as already stated, the chancellor must be

satisfied of both these things, before the divorce should be decreed.

Another thing is observable, from the language used in this section, and that is, that these things must be made fully apparent to the court. They are not left to be determined or judged of by the parties, but by the court. And the chancellor is not to dissolve the relation, upon the mere clamor of the parties, nor upon his mere supposition that they cannot live together in peace and happiness, but it must be made fully apparent—he must be fully satisfied, that what is charged, in this respect, is true. Under the statute, the power given to the court is not the exercise of a discretion arbitrary in its character; but it must be exercised in a sound and legal manner. This law contemplates and requires a cause, or a state of case, justifying a divorce, and the court is called upon to judge whether the proof made, under such a charge, is such as forfeits the marriage contract. And, as was well said in *Ritter* v. *Ritter*, 5 Blackf., 81, the judgment of the court "must not be governed by caprice or prejudice, or wild and visionary notions, with regard to the marriage institution, but should be so directed as to conduce to domestic harmony, and the peace and morality of society." And see *Motley* v. *Motley*, 31 Maine, 490. We also understand that this section of the Code, does not have reference to the temporary peace and happiness of the parties, nor to their temporary welfare, but it was designed, by the legislature, that the chancellor should have regard to their permanent—their general peace, happiness, and welfare. He is to take into consideration their respective ages, temperament, and dispositions—their agreements and disagreements, in past life—the age and condition of their children—the situation of their property; and, in a word, all the circumstances, and every fact within his reach, in arriving at his conclusion. If it shall appear that their estrangement is temporary—that their peace and happiness has been momentarily disturbed, by some sudden ebulition of passion—that time will heal every wound thus made,—duty to the parties, as

Inskeep v. Inskeep.

well as society, demands that the court should refuse the divorce. And, again, a divorce is not to be decreed, for this cause, to the wrong-doer. That is to say, if it shall appear that the parties could live together in peace and happiness, but for the unwarrantable conduct of the complainant—if it is shown that but for his, or her, improper conduct, there might be peace, quiet, and happiness, the relief prayed for should be denied. If it shall appear, however, that the respondent is the guilty party, and the complainant the innocent one, the dissolution should be decreed. And so, also, we think there may cases arise under this law, where the parties are mutually at fault, in which a divorce might be granted. While the law does by no means countenance application for divorce, for slight or frivolous causes—and will not lend its aid to dissolve this relation, whenever the parties' may separate, from some sudden quarrel, or imaginary, or even every real wrong—it will not, on the other hand, refuse to break the chain, where the peace and welfare of the parties bound thereby clearly require it, even though such want of peace and happiness is the result of misconduct on the part of each. There may be such positive incompatibility of temper, as to render it entirely impossible for them to live together in peace and happiness. There may be cases, (and they are not very unusual,) where the improper and indiscreet interference of friends and relations, has produced such a degree of estrangement and alienation of affection, as to render it utterly impossible that peace and quiet can afterwards be found in the household. But in all cases, the court should be satisfied that the parties have, in good faith, endeavored to overcome such incompatibility of disposition—have, in sincerity and in truth, made the effort to banish discord and disquiet from their home, and that there is the absence of anything like collusion. The fault, whether mutual, or on the part of one, must be real and substantial—one which no reasonable effort could eradicate —and not an inconsiderable one, or one which would yield to the genial influences of kindness and affection.

In the case before us, owing to the age of the parties, and the length of time they have lived together, we have felt reluctant to dissolve the relation. And yet, from the whole testimony, we cannot resist the conclusion that they cannot live together in peace and happiness, and that their welfare requires their separation. The more material considerations leading to this conclusion, we will briefly state. And those of a negative character, may be first presented. In the first place, the children born to these parties have now attained their majority, and have each received more than an ordinarily good education. And especially is this true of the three remaining unmarried, at the time of the commencement of this suit. In the next place, there is no such want of property and means, on the part of the respondent, as to present a barrier to his giving the wife a separate maintenance. And, a further consideration is, that he is so situated, in regard to property, that his pecuniary welfare can in no sense be said to be unreasonably prejudiced by decreeing a divorce. And thus it is, that neither the welfare of the children, nor the protection and preservation of property, can be claimed to demand that these parties should be required to live together. Their pecuniary interests, we are satisfied, will not be jeopardized, if a divorce shall be decreed. Their children are so advanced in years and education, as that no prejudice to their welfare is likely to result, if the parents shall be separated.

What we mean by this, is not that there may not be injury to the feelings of the children, occasioned by the unhappy difficulty, and consequent separation between their parents, but that they are no longer of such tender years, as to necessarily need the joint care and attention of father and mother—the restraining influence of the family and home. In the next place, we are satisfied that in this case, the disagreement or difficulty is not of recent origin, but that it commenced before the parties left Ohio, and has grown with great rapidity since their residence in this state. And here we may state, that while the wife

Inskeep v. Inskeep.

has not at all times perhaps, been entirely blameless, yet we cannot say that she is the guilty party, nor that she has been the cause of their want of peace and happiness. We should conclude that she preferred the enjoyment of 'more of social life than was to be found on the quiet farm, while the husband's predilection, was that his path at least, to happiness and competence, was to be found in agricultural pursuits. As their property increased, this feeling on the part of the wife, gathered strength, which we have no doubt, at times, was the occasion of unkind words, and led her to utter complaints which were both unkind and uncalled for. And in this respect alone, is there anything to show that she has been instrumental in bringing about the state of feeling, which finally led to their separation. On the contrary, if the testimony is to be credited, and especially that of their children, (and we see no reason to discredit it), his harsh language has been oft repeated, increasing in severity, up to the time of their separation, in December, 1854. Nothing like personal violence is pretended, but instances of abusive language, quite as well calculated to destroy the peace of the family, and disturb its happiness. Not only so, but we are satisfied that these parties cannot live together in peace and happiness, from the fact that the wife, not without just cause, labors under the conviction that the husband has been guilty of adulterous intercourse with other women, and this conviction or impression, he has never for a moment attempted to remove. Before the last difficulty, he was well aware that complainant entertained such a belief, and that she suspected, to say the least of it, the chastity of Mrs Omick; and yet, he appears to have acted in utter disregard of her feelings in this respect, and to have kept up an intimacy with the person suspected, which, if it was not criminal, was at least of such a character as to induce the belief, that his affections had become alienated from the wife, and entirely engrossed by another. If it is said that the wife was of a jealous disposition, then may it be said that it was his duty, by shunning as far as possible, every

VOL V. 29

appearance of evil, to remove this jealousy, and not by a contrary course, to give food and life to it. But while, as we have before held, there is not sufficient to satisfy us, that respondent has been guilty of the crime of adultery, as charged in the bill, yet we cannot say that there were no circumstances which should excite the just suspicions of the wife, that at least he had the adulterous disposition and intention. The truth is, that she, as well as the children, did suspect this criminal disposition; and not only so, but did believe that he had been guilty of the adulterous intercourse. And this belief and suspicion, he made no effort to remove, but on the contrary, by various acts, to say the least of them, imprudent in their character, he increased the suspicions, and gave additional grounds for this belief. Where a belief, thus well founded, is entertained of the husband's incontinence, to expect that the wife could live with him in peace and happiness, is to require that she should loose her own self respect, and become degraded in the eyes of society and her own family. It is not, be it remembered, that he has been guilty of the criminal intercourse, but that by his reckless, careless and indiscreet conduct, he has occasioned the belief in his criminality, which renders it improbable and unreasonable, if not impossible, that they can live together in peace and happiness. And in this connection, we remark, that not the most inconsiderable of these circumstances, is the fact that after he was thus suspected—after their separation—and even after the bill was filed in this case—he continued to keep the family of Omick on his premises, boarded with them, and took no steps to remove the cause for unkind feeling and unhappiness on the part of the wife.

The length of this opinion forbids, that we should do more than briefly refer to some additional reasons, which induce us to believe that these parties cannot live together in peace and happiness. Prominent among these, is the fact, that since their separation they have made two ineffectual efforts to reconcile their difficulties. We cannot but believe that each party made this effort, with the

honest intention, if possible, of avoiding the unhappy alternative of a legal proceeding.    In each instance, however, the breach would appear to have been widened, rather than narrowed—and they separated with more acidity of feeling than when they met.    Again, it will be remembered, that respondent does not in his answer deny this charge in the bill, but attributes the cause thereof to the complainant.   If there was anything like collusion shown between the parties, we should not allow this failure to deny the charge, to weigh anything.   And we may go even further, and say, that did not the entire absence of anything of this character appear affirmatively, we should not be inclined to allow the failure to deny the allegation, to be accounted against respondent.   Where, however, the right to the divorce is contested so strenuously, as in the case before us—where the respondent has apparently spared no pains to procure testimony to show that he is the innocent, and complainant the guilty party— where even the suspicion of collusion is rendered entirely improbable by everything which has transpired between them, since the separation—we feel justified in saying, that if in the opinion of respondent, the parties could have lived together in peace and happiness, he would at least have so claimed.   It is true, that if he had admitted this charge, neither the court below nor this court would have been concluded thereby, but would have been fully justified in considering the proof, on examining into the whole case.   *Lyster* v. *Lyster*, 1 Iowa, 130.   So, the admission implied from the failure to deny, might not, unaccompanied with proof, be sufficient.   But when taken in connection with all the other circumstances in this case, it is entitled to and should receive some weight.   Satisfied, as we are, therefore, from all the testimony, that these parties cannot live together in peace and happiness, we are still to inquire whether it is likewise apparent that their welfare requires their separation.   As to this we have more doubt, than on the first part of the inquiry.   And yet, we must acknowledge, as before suggested, that the welfare of the

parties to this relation, is so inseparably connected with their peace and happiness, or may be said to be so strictly dependant upon them, that it is difficult to. say why their welfare does not require the dissolution of a relation, which has ceased to be cherished from affectionate motives, and which is promotive of anything rather than peace and happiness.   And where it is fully apparent that they cannot live together in peace and happiness, and where there is nothing to show that any good end is to be subserved by entertaining the relation—where there is nothing to show that they should continue to live in unhappiness and discord, in order to secure their welfare—we think that the divorce should be granted.

In this case, we can see no good reason why it is essential to the welfare of the parties, that they should be held in this union—a union which it is very manifest is alike unpleasant, indeed, almost loathsome, to each of them.   We feel satisfied, that if this  divorce should be denied, they will never live together ; or, if they did, it would be to each a life of continual and increasing disgust and unhappiness. Their welfare certainly would not be promoted,  therefore, by such refusal.   If they stand separated, however, by a judicial decree—each left free to act for himself or herself— we incline to the opinion that  their mutual welfare, (and this is what we are to regard), will be thereby promoted and secured.

It being thus concluded, that the complainant is entitled to a  divorce, the  third question presented by counsel is, whether it shall be a divorce from the bonds of matrimony, or from bed and board.   It will be  remembered that this bill was filed January 2d, 1855,  and the amendment thereto on the 25th of the  same month.   By the  code, which was in force when this bill was filed,  the complainant, for this cause, was entitled to a divorce *a vinculo  matrimonii*. On the 24th of January, 1855, however, an act was passed amending the law in relation to divorce and alimony, which provides  " that hereafter, no divorce otherwise  than from bed and  board, shall be  granted, except for the  following

causes "—and then follows four causes, not including the one relied on in the amendment of complainant to her bill, and which we have determined is sustained by the proof. Complainant insists that her right to an absolute divorce is not taken away by this law, which was passed and took effect after the commencement of her suit. Respondent, on the other hand, urges that it was entirely competent for the legislature to change the law, and have it take effect either upon the cases then pending, or upon cases afterwards commenced, for causes transpiring prior to its passage.

The act of January 24th, did not take effect until the 1st of July, 1855, and until that time had no operative force. It was, therefore, inoperative until long after the amendment was made, by complainant, to her original bill. In this case, we are not called upon to determine what would have been the effect of the repealing act, if it had been in force at the time of the filing of the bill. The suit was commenced prior to the repeal, and the complainant's whole cause of action fully preferred, before the repealing act took effect. And it is saved, we think, by the code, section 26, which provides that the repeal of a statute, shall not effect any proceeding commenced under, or by virtue, of a statute repealed. If this proviso does not extend to, and include a case of this character, then, we think, it would be utterly meaningless, and without force. The suggestion, that the act of the 24th January, 1855, repealed this section, as well as certain portions of chapter 86 of the code, is entirely untenable. This section is a part of the chapter which gives to us general rules for the construction of statutes, and the repealing law does not refer or relate to it in any manner, nor does it propose to give any rule upon that subject. We conclude, therefore, that complainant's case is unaffected by the repeal, and that she is entitled to an absolute divorce.

We finally inquire, whether there is any good reason for disturbing the decree below, on the subject of alimony. And, while we entertain no doubt but that it is entirely competent for the court, under section 1485 of the code,

to give to the wife a portion of the husband's property, either real or personal, absolutely and in her own right, we are also of the opinion that this should not be done, if the husband is in a condition to pay money, unless there is something in the situation of the wife, which would render it equitable and just to give her the property in the place of money.

If the husband's means consists of lands and personal property, then it might be oppressive to require him to pay money, and eminently to her interest, to give her a specific part of his estate. If, on the other hand, it appears that he has a large cash capital, which he can readily command—that it is to his interest, as well as that of his children, who will probably inherit the same—that his landed estate should remain undivided, then money, and not property, it would seem, should be given to her. And, again, if one or more children, of tender age, should be entrusted to her care and custody, there would be a propriety in decreeing to her a place for a home, or real estate, upon which she might erect a home for herself and family. And thus, numerous considerations would enter into the inquiry—each case depending, to a great extent, upon its own peculiar circumstances. In every case, however, the decree should be so framed and made, as to have a due regard to the rights and interests of each party, and of the children who may be dependant upon them.

In the case before us, there does not seem to us to be a necessity for giving to the wife any portion of the husband's lands. It is evident, from the proof, that he has a large amount of money, and personal property, and that to decree a sum in money will not work oppressively, or create the necessity for the disposition of his real estate. In addition to this, he avers a willingness to pay in money rather than in property, if a divorce shall be decreed. While such averred willingness should not be controlling, it is, nevertheless, entitled to weight, as showing that the interest of one party to this unhappy difficulty, will not be prejudiced by such an order. It is also to be remembered,

that there are no young children requiring the care of the mother, and the consequent necessity that she should be provided with a home, to keep them together, where she may the better provide for their nurture and education. It is true, there are children, and the wife must have a home, and those children may prefer to remain with the mother, but the expenses appertaining to their support and proper education, if chargeable to either, must devolve upon the father, and not upon the mother. And while she, of course, must have a home, there is not the same controlling necessity for giving her that from some specific property of the husband's, as there would be, if she had children peculiarly dependant upon her. And, in addition to this, we may add that, for such home, it is not shown that respondent has property suitable therefor, unless it be the farm, known as the " homestead," which we could not decree to her, consistent with our views of the relative rights and interests of the parties. And a final consideration, on this part of the case, lies in the fact that, as respondent may be required to provide for his children, there would appear to be a propriety in leaving to him his lands, which, being made productive, may assist him in that duty.

If the alimony decreed to the wife, is to be in money, what shall be the amount thereof? The report of the master, shows that the total value of the property of respondent, at the time of the decree below, after deducting debts, was about $16,000. In this amount, was included one demand then in litigation, of about $500, and matters of a character which could scarcely be accounted or estimated at the sums stated in the report. The court below decreed to her about $4,150 in money, and some town lots, valued at $850. In addition to this, respondent must pay all the costs of this proceeding, amounting to not less than from four to five hundred dollars. Under all the circumstances, and after giving to this part of the case, the most careful thought, we conclude that the decree below, should stand undisturbed, so far as it decrees the amounts

in money, as therein stated, and that this should be in full for the alimony of the wife, and of all her rights to the husband's estate; and that so much of said decree as gives to her any portion of the husband's real estate, be reversed.

The decree of the District Court will, therefore, be affirmed, except in the particular above stated, and the cause remanded, with instructions to that court, to modify the former decree in this respect, with the further order also, that respondent may at any time, by paying the aggregate amount of the sums remaining unpaid, fully discharge the several semi-annual payments therein provided for.

Decree accordingly.