T. S. HATFIELD *v.* SADIE HATFIELD

(No. 7363)

Submitted September 21, 1932.    Decided December 6, 1932.

*W. E. R. Byrne,* for appellant.
*Chas. Ritchie* and *Coleman A. Hatfield,* for appellee.

LIVELY, JUDGE:

By its decree of January 11, 1932, the circuit court of Logan county sustained the adulterous charge alleged by T. S. Hatfield in his divorce proceeding against his wife, Sadie Hatfield, and granted him a divorce *a vinculo* and the custody of his three infant children. Upon motion of the litigants, the appeal granted Sadie Hatfield is now considered as a motion to reverse said decree. Appellant charges error (1) in the trial court's refusal to remove the proceedings to another circuit; (2) in the granting of a divorce to the husband; and (3) in refusing to grant appellant custody of the children and a divorce based on her charges of adultery and

cruelty on the part of T. S. Hatfield (alleged in her answer and cross-bill and denied by the husband.)

Did the court err in its refusal to transfer the proceeding to another circuit? When this proceeding was considered by this court before (*Hatfield* v. *Hatfield,* 109 W. Va. 212, 153 S. E. 493), a reason for remanding the cause was the trial court's failure to dispose of defendant's motion to remove the cause to another circuit. Thereafter, defendant renewed her motion for removal of the cause to such a circuit court as would not be under the alleged domination of Hatfield; and, in support thereof, filed affidavits of Grant Walters (defendant's brother), Ethel Walters, his wife, and Hobert Ramey. The essence of these affidavits was that it would be perilous for Sadie Hatfield, or any witness in her behalf, to appear in Logan county in the prosecution of her cause. The order, which denied removal of the proceeding, shows that, in opposition to the wife's motion, testimony of twelve persons was taken in open court and that affidavits of some of the witnesses were likewise filed. Neither the testimony itself nor the purport thereof is made a part of the record. By statutory enactment (Code, 1923, ch. 128, sec. 1), removal of such a cause to another circuit court lay in the discretion of the trial court; and although the court's action is reviewable by the appellate court, reversal is always predicated upon error which appears from the record. In the absence of any affirmative showing that the discretion vested in the trial court has been abused, this court will not interfere with its conclusion.

The litigants were married in 1917, and for a time lived in Barnabus, Logan county; but in 1925, upon the election of plaintiff as sheriff of Logan county, the parties took up their residence at Logan and had their living quarters in connection with the county jail. Separation occurred on November 18, 1928, when, as defendant alleges and details in her testimony, she left her home when warned that her husband was coming to kill her.

The husband charges his wife with adulterous conduct, but it would serve no useful purpose to detail the evidence adduced to prove the charges. Several witnesses testify to acts of sexual intercourse with the wife during the latter part

of 1927 and during 1928, while others narrate witnessing scenes of indecorum. Some of the testimony details such flagrant improprieties as to becloud the credence of the relators. The finding of adulterous conduct on the part of Sadie Hatfield is substantially supported by the evidence, and we shall not disturb the conclusion of the lower court on that issue.

The prayer of Mrs. Hatfield's cross-bill would dissolve the marital status in her favor on charges of cruelty and adultery on the part of T. S. Hatfield. The testimony of Mrs. Hatfield, in some instances corroborated by others but denied in totality by the husband, evidences several occurrences of physical violence and one when he, striking her with a whip, "cut the blood out clear around". The wife depicts her husband as a person of vicious habits and character and addicted to the use of intoxicants. The acme of cruelty, according to her, was evidenced on the night of her departure from Logan when, late at night and scantily clad, she was hurried from her home as she prepared for sleep that she might evade a death threat made by her husband and communicated to her by his nephews. Such an intention is denied by Hatfield who, however, related that he had been informed that his wife was with another man (J. E. Simms) and that he and others had searched for them. To repudiate the accusations of cruelties, Hatfield tells of his gifts to her in the form of luxurious clothing, expensive automobiles, and costly jewels, and Mrs. Hatfield admits she was the recipient of these generosities. Such conduct does not seem consonant with the wife's charges of cruelty. Likely, Hatfield was not the gentle spouse but it appears that some of the bickerings which occurred were prompted by accusations on the part of the wife. Hatfield's denial of the alleged acts of cruelty was sustained by the trial chancellor; and on conflicting testimony this court cannot say there is error in that conclusion.

Various imputations of immorality on the part of Hatfield are detailed by Mrs. Hatfield and others. She relates an incident in 1928 when she found her husband in bed with Virginia Pugh; an occasion when she witnesses a kissing scene between her husband and Bessie Chafin, who, the wife imputes, figured in the sensual affairs of her husband as early as 1922; and

she points to his association with Margaret Botney as a violation of his marital duty and that, prior to her departure, his libertine practices had produced an illegitimate child. Another witness describes an incident where he found Hatfield, in his office, exercising familiarity with a Nelson girl whose clothing was pulled above her knees. Grant Walters, a brother of Mrs. Hatfield, in substantiating his sister's charge of infidelity against Hatfield, relates a conversation between him and Hatfield wherein the latter sought his aid in persuading Sadie Hatfield to spend several months of 1928 away from Logan, the reason assigned by Hatfield therefor being that Mollie White was ''laying that baby she is going to have to me'' and that his wife ''will raise the devil and maybe knock Joe (brother of Hatfield and candidate for the nomination of sheriff) out of the nomination''. There is substantial evidence that Tennis Hatfield was frequently seen, in his automobile, in company with Margaret Botney, a girl sixteen years of age, whose mother, of foreign birth, was the proprietress of a hotel visited frequently by Hatfield who claims his visitations were occasioned by politics and the campaign current in 1928. While one witness states that Margaret Botney and Hatfield did not remain in the lobby of the hotel with others but that ''they had a room like that, seemed like they met in,'' the same witness admits ''the family would be in and out'' and that if he found the girl and Hatfield alone, they were sitting on chairs. There is evidence also that on one occasion Hatfield followed the girl into a room at the hotel and that they remained therein for thirty or forty-five minutes. According to Hatfield, his acquaintance with Margaret Botney, prior to his wife's departure, was merely casual. It is not denied, however, that, following the separation of the litigants, Hatfield established the Botney girl in charge of his home and children. Both Hatfield and the girl deny any improprieties or illicit relationship. The evidence discloses correspondence purporting to have been written by Margaret Botney but denied by her. One letter, written on stationery with a printed heading ''Mrs. T. S. Hatfield, care of Logan County Jail, Logan, West Virginia, reads, in part: ''Tennis and me gets along fine. We was for a fishing trip * * * and had more fun. He's better to me and never whips me any

more.'' Sadie Hatfield testifies that she had never used stationery of the kind signed ''Margaret''. Another letter signed ''Margaret'' and addressed to ''Miss Mary Stanley, Martin's Ferry, Ohio'', relates the purchase of expensive clothing and attendance at ''the reunion''. It is difficult to ascertain from the testimony of Margaret Botney just how soon after Mrs. Hatfield's departure that she became employed by Hatfield; but it is clear that intermittently Margaret Botney would visit her mother in Ohio, each time remaining there for several months and then returning to Hatfield's employment. Her testimony was taken just a few days after her return from one of her prolonged visits. All accusations and inferences of immorality are denied not only by Hatfield but by other witnesses. The scene Mrs. Hatfield describes between the Pugh girl and Hatfield is countered by members of the Pugh family who assert their presence in the room where Hatfield and the girl where at the time of the wife's visit to the Pugh premises and deny any improprieties on Hatfield's part. The Botney girl refutes the testimony of Mrs. Hatfield's witnesses who tell of Margaret Botney's being with Hatfield either in the automobile or in any room alone; and both Hatfield and the girl deny any illicit acts. Likewise, the denials of improper conduct by Bessie Chafin and Edna Nelson militate against the testimony of the wife and her witnesses. On conflicting testimony, the trial chancellor has given approval to the divorce commissioner's finding which absolved Hatfield from the charge of adultery; and we are not disposed to disturb that finding under the adduced evidence. But, may we give such approbation to Hatfield's conduct as to dissolve the marital status in his favor?

We have just noted that under the evidence Hatfield may not be stamped an adulterer; for if such had been the finding then Hatfield would have been guilty of recrimination such as to preclude his procuring a divorce. Such appears to be the rule applied generally throughout the United States by the courts which pay tribute to the time-honored rule that the spouse who has violated his or her own marriage vows is in no position to complain that the other has done the same. *Wass* v. *Wass*, 41 W. Va. 126, 23 S. E. 537, Schouler, Marriage, Divorce, Separation and Domestic Relations, 6th Ed., Vol. 2,

section 1721. As expressed by one court: "If both parties have a right to divorce, neither party has." *Hoffman* v. *Hoffman*, 43 Mo. 547, 549. The principle is predicated upon the equitable doctrine of "clean hands" and legal historians trace its legal inception to the Roman Law wherein it was called *compensatio criminis*"; but it is significant here to note that divorce was not permitted under the Roman Law and that the doctrine of *compensatio criminis* affected property rights only and predicated no attitude towards matrimony. In England, the Ecclesiastical judges injected the doctrine into divorce proceedings. (*Forster* v. *Forster*, 1 Haggard's Consistory 144; *Proctor* v. *Proctor*, 2 Haggard's Consistory 292); but it is again worthy of note that under the Ecclesiastical law there was no judicial dissolution of valid marriages, and divorces from bed and board were allowed only for adultery and cruelty. 19 C. J., p. 96, note 3 (a). The Matrimonial Causes Act (1857) left the refusal of a divorce *a vinculo* for the adultery of the petitioner in the discretion of the court; but English cases recognized limitations on the exercise of such discretion. See *Tickner* v. *Tickner* (1924), Probate Division 118; Bishop on Marriage, Divorce and Separation, Vol. 2, 357 et seq. In the United States, the courts generally have adhered strictly to the doctrine of recrimination; but there are a few decisions which approve a relaxation of the doctrine or an exception thereto (known as comparative rectitude), and there are some instances where courts have relaxed the doctrine as a practical matter, while paying lip-service to the theory of the principle. (For cases approving the principle or qualification of comparative rectitude see *Weiss* v. *Weiss*, 174 Mich. 431, later repudiated in *Hatfield* v. *Hatfield*, 213 Mich. 368; also, *Johnson* v. *Johnson*, 78 Wash. 423; *Inskeep* v. *Inskeep*, 5 Iowa 204.) In addition to Michigan, the Nevada court expressly refused to recognize the doctrine of comparative rectitude. *Blankenship* v. *Blankenship*, 276 P. 9; Note 63 A. L. R. 1132. The Nebraska court in *Goings* v. *Goings*, 90 Neb. 148, although both parties were guilty of misconduct, decreed to the wife a divorce *a mensa* but said nothing of comparative rectitude. What may be said in behalf of any tendency to relax the doctrine of recrimination? Here attention is directed to the statement that whatever discussion

follows on the aforementioned inquiry relates to the personal view of the writer and is not to be considered as a pronouncement of the court, for, by legislation in this jurisdiction, adultery on the part of the petitioner is a bar to a divorce for any cause, if the adultery, not condoned, was committed within three years prior to institution of the cause for divorce. Official Code, 1931, 48-2-14.

Reverting to the inquiry we must not lose sight of the fact that the parties in a divorce proceeding differ from those in the ordinary civil suit or action. In the former cause, the state looks to the trial chancellor as a protector of its interest in an orderly society, in the welfare of the children which might be affected by a divorce decree, as well as the welfare of every citizen; hence, it would seem a strict application of the clean hands doctrine, without more, is merely a punishment of the litigants and omits consideration of the interests of those innocent but who are adversely affected by a decree which leaves the parties in the situation where they have placed themselves. Divorce is the climax of domestic discord; the affections which united the parties in marriage have disappeared and hate and disharmony have loomed in their places. To compel two persons to live together under such circumstances would seem to do violence to the moral sensibilities of an enlightened age. If time evinces mistake to the errant parties; the law permits them to re-marry; if not re-marriage to each other, then perhaps a lost paradise regained through another marriage. Is not the interest of society generally best subserved by a dissolution of the marital status and the possibility of future respectability through re-marriage rather than a pretended legal cohabitation attended by probable promiscuity to satisfy the human passions? Courts which administer the divorce laws should not close their eyes to the physiological and sociological imperfections of mankind. Even so early as 1819 when Sir Wm. Scott delivered his opinion in *Proctor* v. *Proctor, supra,* he recognized the mischiefs which might follow the application of the rule when he stated: ''I cannot blind myself to the fact that the modern course of life and manners does not furnish those corrections of the mischief that may follow, which the canon law had anticipated in connexion with its rule. There is no return to

cohabitation, nor are any means to be restored to for the purpose of compelling it. In the state of separation, whether authorized or merely conventional, which usually takes place, there is certainly the increased danger of spurious offspring, and, as the regulations of property exist among us, the danger of separate debts, to the great eventual injury of the husband and his legitimate family.'' For a contrary view, see a discussion by Judge Poffenbarger in *Hall* v. *Hall*, 69 W. Va. 175, 179, 71 S. E. 103.

To constitute recrimination in divorce law, the conduct relied upon as such and as a bar to relief must be sufficient to constitute ground for divorce (Bishop, *supra,* sec. 340), and it is of no consequence that the offense committed by the petitioner had no causal relation with the misconduct of the respondent.

It may be pointed out, however, that this court has denied a decree of divorce in instances where petitioner's conduct was not recriminatory, but merely inequitable (*Hall* v. *Hall*, 69 W. Va. 175, 71 S. E. 103, 104; *Maxwell* v. *Maxwell*, 69 W. Va. 414, 71 S. E. 571; *Hamilton* v. *Hamilton*, 87 W. Va. 534, 105 S. E. 771; *Murrin* v. *Murrin*, 94 W. Va. 605, 119 S. E. 812; *Edwards* v. *Edwards*, 106 W. Va. 446, 145 S. E. 813); and the pertinency of the rule arises when we seek to determine the limits to which the court should apply the rule. In other words, what shall constitute ''inequitable conduct'' which shall be a bar to petitioner's divorce? This involves consideration of our cases above cited.

Judicial expression of the inequitable conduct doctrine as a bar to relief seems to have appeared first in this jurisdiction in *Hall* v. *Hall, supra,* when Poffenbarger, J., wrote: ''Inequitable conduct on the part of the plaintiff, though it does not amount to cause for divorce, suffices to defeat his application for relief.'' In that case, the husband sought a divorce *a mensa* on the ground of desertion; the wife charged misconduct on the part of plaintiff as reason for her absence, upon which she relied as a bar to the relief asked; and the appellate court, in sustaining the marriage status found the misconduct of plaintiff as the reason for the wife's desertion. In other words, the complaining party was responsible for the situation of which he complained. This case is cited in

Keezer, Marriage and Divorce, p. 303, n. 96, as an application of the rule of comparative rectitude.

The next pronouncement of the rule by this court appeared in *Maxwell* v. *Maxwell, supra,* wherein point 4, Syllabus, reads in part as follows: ''Courts of equity are not open to give relief to husband or wife if the complaining party be responsible in a substantial degree for the wrongs and injuries complained of.'' The wife relied on charges.of cruelty for a divorce a *mensa;* and the language employed in the opinion is that ''if the fact be, as the evidence in this case tends to show, that plaintiff was herself guilty of crimination and re-crimination, and of the like abuse of abusive language and epithets against defendant, and was guilty of conduct unbecoming her as a consort, and thus brought upon herself the troubles of which she complains, a court of equity should deny her relief.'' Thus, the situation is one created, in part at least, by the spouse seeking relief.

In *Hamilton* v. *Hamilton, supra,* the wife justified her alleged desertion, set up by her husband as grounds for divorce, on the grounds of cruelty and consent to the separation. There was no evidence of violence or of such mistreatment as to cause impairment of health; and so, the court found that there was no justification for defendant's absenting herself from plaintiff's home. However, ·the evidence shows that plaintiff had a disagreeable temper which evidenced itself to the discomfort of defendant; that on several occasions plaintiff had told defendant to leave; and that despite his protest on her leaving, he gave her the means of departure, knowing the use defendant intended to make of the money. It was the reprehensible conduct on the part of plaintiff, though not sufficient to constitute grounds for a divorce to the wife, which caused her to leave.

In *Murrin* v. *Murrin, supra,* the wife sued for divorce *a mensa* on the ground of cruelty, while the husband, denying the alleged cruelty, sought a divorce *a vinculo* based on the wife's adultery. By her evidence, she attempted to show her husband's indifference to the welfare of his family; his accusation of her prostitution and adultery; his torturing her by twisting her wrists; and his threats to shoot her. The trial chancellor granted relief to defendant; but the appellate

court concluded that, while the evidence was not sufficient to convince the judicial mind that the wife was guilty of adultery, nevertheless her conduct had been indiscreet and precluded her from relief on that ground, although the opinion does not expressly find defendant guilty of cruelty. Physical violence to plaintiff was resultant from her own conduct.

Likewise, in *Edwards* v. *Edwards, supra,* the conduct of Mrs. Edwards in absenting herself from her husband's home forty per cent of the time, applying to him unprintable epithets; telling his children that he was guilty of high crimes in order to estrange them from him; and in receiving the attention of other men in his absence and under circumstances which aroused strong suspicion of her marital infidelity; all prevented her from obtaining from him a divorce, but in no sense *justifying* her husband's misconduct, although her conduct may have had a powerful bearing thereon. We recognized the causal relation of her conduct as affecting his, but in no way *justifying* his adulterous acts.

Thus, we find that in each of the cases in which petitioner's relief has been barred by reason of "inequitable conduct", there has been a causal relation between such conduct and the offense charged against the respondent upon which the petitioner sought a divorce. Of course, where respondent's offense is in no manner connected with misconduct of the petitioner, and that misconduct is insufficient on which to base a ground for divorce, then petitioner's misconduct will not bar his relief.

What was there in the misconduct of Tennis Hatfield which caused or contributed to the adultery of Sadie Hatfield? We have already concluded that the finding of the lower court negatived the charges of cruelty and adultery. There is, however, no denial that Hatfield placed Margaret Botney in charge of his home and children a short time after his wife left. This circumstance lends color to the stories of persons who tell of the companionship between Hatfield and the girl before Mrs. Hatfield's departure as to arouse suspicion; but this occurred after Mrs. Hatfield left and therefore could not be said to have been cause for her infidelity.

We find no error in the judgment of the trial chancellor and therefore affirm the decree.

*Affirmed.*