C., PLAINTIFF-APPELLANT, v.
C., DEFENDANT-RESPONDENT.

Argued February 17, 1969—Decided June 27, 1969.

*Mr. Bernard L. Albert* argued the cause for plaintiff-appellant (*Mr. Albert,* of counsel and on the brief; *Messrs. Goldstein & Albert,* attorneys).

No appearance by respondent.

The opinion of the court was delivered by

SCHETTINO, J. This is an uncontested divorce action stemming from defendant's alleged desertion of plaintiff in 1963. The trial judge was satisfied that defendant's desertion was established, but nevertheless, denied the divorce, holding that plaintiff's adultery in 1966 operated to bar her divorce under the doctrine of recrimination. We granted appellant's motion for certification prior to argument in the Appellate Division.

The defendant-husband, age 32, and the plaintiff-wife, age 25, were married on April 11, 1959. Their stormy marriage lasted until defendant deserted plaintiff on September 22, 1963, never to return. The two children born of this union are presently separated, one in the custody of defendant and the other in the custody of plaintiff's mother. Prior to his desertion, defendant also sired three illegitimate children by his wife's sister.

After plaintiff's cause of action for desertion had matured she began to have an affair. She admittedly had illicit sexual relations during the latter part of 1966, resulting in the birth of a child on May 17, 1967. Both plaintiff and the father of that child have expressed a desire to marry and legitimize the offspring of their affair.

The issue before us is whether the trial judge erred in raising on his own motion plaintiff's recriminatory acts of adultery thus barring a decree of divorce.

We synopsize the history of recrimination. As first found in Roman law, recrimination was used as a means for adjusting property rights between the spouses in the *actio rei uxoria*. The doctrine was wholly inoperable as a device for denying divorce because divorce at that time was not a judicial function. Discontinuance of the marriage depended entirely upon the discretion of the husband. See discussion in *Forster v. Forster*, 161 *Eng. Rep.* 504, 506 (*Consist.* 1790).

An excellent summation of the development of recrimination from this point to its emergence in American law is provided by Beamer, "The Doctrine of Recrimination in

Divorce Proceedings," 10 *U. Kan. City L. Rev.* 213, 243 (1942) [hereinafter Beamer].

In New Jersey, evidence that the doctrine of recrimination has been uniformly utilized to deny the grant of a divorce where both parties have violated the marriage contract is found as early as 1863. See *Marsh v. Marsh,* 16 *N. J. Eq.* 391 (*Ch.* 1863) (where it was noted that the requirement of specificity in pleading applies to the bill charging adultery as well as to the answer setting it up by way of recrimination). In *Adams v. Adams,* 17 *N. J. Eq.* 324 (*Ch.* 1866), the court recognized that desertion would not be a defense to adultery in the English ecclesiastical courts. This observation was not considered controlling, however, and since desertion, cruelty and adultery were placed on the same footing in New Jersey with respect to their effect on the marriage contract, Chief Justice Beasley, sitting as Master, suggested that any one of the three should be a defense to the other. 17 *N. J. Eq.,* at 328. The Chief Justice did not acknowledge, however, a distinguishing feature of the ecclesiastical courts—they were not empowered to grant an absolute divorce, but were limited to divorce *a mensa et thoro.* Recrimination was used by these courts as an adjudication of property rights similar to the *actio rei uxoria* of Roman times. Although the ecclesiastical courts could not compel a guilty husband to restore his guilty wife's property, by using recrimination as a bar to a divorce from bed and board, they could require a husband to either cohabit with his wife or agree on a private separation settlement. Beamer, 10 *U. Kan. City L. Rev.,* at 227–28.

Propelled by *Adams,* recrimination in New Jersey soon developed into a mechanical and absolute bar, the application of which was required once the proofs established its pertinence.[1] See, *e. g., Sheehan v. Sheehan,* 22 *N. J. Super.* 326

---

[1] The New Jersey Legislature has never established recrimination as a bar to an action for divorce with the exception of adultery as a bar to adultery. *N. J. S.* 2A:34–7. We need not concern ourselves here with that statute, however, since this action presents the problem of adultery as a bar to desertion.

(*App. Div.* 1952) (where in granting plaintiff's motion for voluntary dismissal the court indicated that proof of plaintiff's adultery would constitute a complete bar to her action for divorce based on her husband's cruelty); *Rapp v. Rapp,* 67 *N. J. Eq.* 236 (*Ch.* 1904) (where in an uncontested case the recriminatory act of desertion was held to bar complainant's action for divorce on the ground of adultery).

As has been shown, recrimination today bears little resemblance to the operation of the doctrine in its genesis. Although this divergence by itself provides sufficient grounds on which to scrutinize the continuing validity of the doctrine, we need not rely solely on this reason. A more compelling infirmity is found in the invalidity of the present-day justifications usually given in support of the doctrine. One justification—the validity of which is suspect—is that application of the doctrine tends to hold a family together. Once a marriage has reached the divorce proceeding stage, ordinarily a decision denying divorce has little chance of restoring life to what has become a dead and empty shell of its former being. While the shell may be preserved, the family as a sociological unit is not. See generally, Beamer, 10 *U. Kan. City L. Rev.* 213.

In the present case, for example, the family as a unit is without hope. The father has deserted with no desire to return, as stated above the children are separated, and the wife, whose cause of action for desertion vested long ago, has no interest in perpetuating a thoroughly bankrupt union.

Another justification — the protection of a wife's right to support — needs little discussion. A wife is better protected by such property settlement as the parties may make, or by an order for support.

Notwithstanding the lack of justification for the doctrine, more important is the detrimental effect which the application of the doctrine produces on both the parties and society. In *Hatfield v. Hatfield,* 113 *W. Va.* 135, 167 *S. E.* 89, 91–92 (1932) the court stated:

"[I]t would seem a strict application of the clean hands doctrine, without more, is merely a punishment of the litigants, and omits consideration of the interests of those innocent but who are adversely affected by a decree which leaves the parties in the situation where they have placed themselves. Divorce is the climax of domestic discord; the affections which united the parties in marriage have disappeared, and hate and disharmony have loomed in their places. To compel two persons to live together under such circumstances would seem to do violence to the moral sensibilities of an enlightened age. If time evinces mistake to the errant parties, the law permits them to remarry; if not remarriage to each other, then perhaps a lost paradise regained through another marriage. Is not the interest of society generally best subserved by a dissolution of the marital status and the possibility of future respectability through remarriage rather than a pretended legal cohabitation attended by probable promiscuity to satisfy the human passions? Courts which administer the divorce laws should not close their eyes to the physiological and sociological imperfections of mankind."

And see *Matlow v. Matlow*, 89 *Ariz.* 293, 361 *P. 2d* 648 (1961) (where it was noted that application of the doctrine of recrimination to a marriage which has totally failed is a degradation of marriage and a frustration of its purposes, resulting from the use of recrimination as a device for punishment).

Application of the doctrine results in a "failure to recognize that the considerations of policy that prompt the state to consent to a divorce when one spouse has been guilty of misconduct are often doubly present when both spouses have been guilty. The disruption of family relationships, the clandestine associations with third parties, and the oppressive effect upon children and the community are intensified." *De Burgh v. De Burgh*, 39 *Cal. 2d* 858, 250 *P. 2d* 598, 601 (1952) (where it was indicated that a divorce could be granted to both parties if the findings on remand so justify).

In the past, although admittedly in another context (common law immunity), we have not hesitated to initiate change in a well established doctrine in an attempt to bring the law into focus with modern society. *Collopy v. Newark Eye and Ear Infirmary*, 27 *N. J.* 29 (1958). Judges of an earlier generation may have viewed recrimination as a sound judicial

doctrine which furthered the moral, social and economic welfare of the people of the state, but when judges of a later generation reach a contrary conclusion they must be ready to discharge their responsibilities in conformance with modern concepts and needs. Accord, *Collopy v. Newark Eye and Ear Infirmary, supra*. And in *State v. Culver*, 23 N. J. 495, *certiorari* denied, 354 U. S. 925, 77 S. Ct. 1387, 1 L. Ed. 2d 1441 (1957), this Court considered the significance of the term "otherwise" as used in *Art*. XI, § I, *par*. 3 of the 1947 *Constitution* which states that all law, statutory and otherwise, shall remain in full force until it expires or is superseded, altered or repealed by the *Constitution* or *otherwise*. In noting that the common law process of change is included in that term, Chief Justice Vanderbilt stated (at 505) :

> "One of the great virtues of the common law is its dynamic nature that makes it adaptable to the requirements of society at the time of its application in court. There is not a rule of the common law in force today that has not evolved from some earlier rule of common law, gradually in some instances, more suddenly in others, leaving the common law of today when compared with the common law of centuries ago as different as day is from night. The nature of the common law requires that each time a rule of law is applied it be carefully scrutinized to make sure that the conditions and needs of the times have not so changed as to make further application of it the instrument of injustice. Dean Pound posed the problem admirably in his *Interpretations of Legal History* (1922) when he stated, 'Law must be stable, and yet it cannot stand still.' And what has been done in the past is but one of the factors determinative of the present course of our law — a truism which has not gone unrecognized among the great thinkers of the legal profession."

The re-examination of recrimination as a viable doctrine has begun. In New Jersey recrimination once was applied mechanically and absolutely whenever the proofs disclosed that the complainant was likewise guilty of an offense against the marriage contract sufficient to justify a divorce for defendant were it the only offense established. Thus, the trial court in *Wells v. Wells* felt compelled to deny divorce by

reason of the recriminatory defense of adultery nothwith-
standing that the court's sympathies laid with the plaintiff.
73 *N. J. Super.* 545 (*Ch. Div.* 1962). The Appellate Division
affirmed by a 2–1 vote. 79 *N. J. Super.* 388 (*App. Div.*
1963). We reversed. 41 *N. J.* 594 (1964).

By our reversal in *Wells* we laid to rest the rule that re-
crimination is an absolute defense and an automatic bar to
a grant of divorce which the trial judge must raise *sua sponte*
when the proofs so justify. We indicated there that assuming
a court has discretionary power to raise, *sua sponte,* a re-
criminatory bar, it was error to exercise that bar under the
facts of *Wells.*

Since *Wells,* courts have occasionally declined to
raise recrimination as a bar to a divorce in an uncontested
case. *E.g., X. v. Y.,* 103 *N. J. Super.* 218 (*Ch. Div.* 1968);
*cf. B. v. S.,* 99 *N. J. Super.* 429 (*Ch. Div.* 1968). As was
demonstrated by the trial court here, however, the practice
has not been universal. Today, we hold that in an uncon-
tested case, absent extraordinary circumstances, a trial court
should not on its own motion raise a recriminatory defense.
We qualify this holding only because it is not possible to
foresee all situations which might arise. We emphasize, how-
ever, that the facts would have to be most extraordinary to
justify departure from the basic rule that recrimination
should not be raised *sua sponte* in an uncontested case.

We leave open, however, the question which might arise
in an uncontested case where a recriminatory act is suggested
by the evidence, but where the facts indicate that the issue
of the wife's support should not be foreclosed. In such a
case it might not be unreasonable for the trial court, on its
own motion, to condition relief in terms appropriate to
protect the wife's interest. We also leave open the role of
recrimination in a contested case.

Reversed and remanded to the trial court for the entry of
judgment for plaintiff.

*For reversal and remandment*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN — 7.

*For affirmance* — None.