# CHARLESTON.

MAE MCCORMICK EDWARDS *v.* C. FRED EDWARDS

(No. 6224)

Submitted October 23, 1928. Decided December 4, 1928.

*Scott, Graham & Wiswell,* for appellant.
*O. J. Deegan* and *Connor Hall,* for appellee.

MAXWELL, JUDGE:

The plaintiff and the defendant were married in 1903; they were subsequently divorced, and were remarried in 1908. This suit for divorce was instituted in April, 1926. The plaintiff charges the defendant with cruelty, desertion and adultery, and prays for a divorce from bed and board and for alimony. The defendant denies the charges of cruelty and desertion and certain of the alleged acts of adultery, and in his cross-bill charges the plaintiff with inequitable conduct and adultery, and prays that a divorce from the bonds of matrimony be awarded him. The trial court denied to the defendant the relief sought by him in his cross-bill, and held that the plaintiff was entitled to the relief for which she prays. She was awarded a divorce *a mensa et thoro* from the defendant. She was allowed a gross sum of $15,000.00 payable in three equal installments in thirty, sixty and ninety days, respectively, after the date of the entry of the order "for the purpose of purchasing a modest home for the plaintiff", $750.00 per month alimony, and was adjudged to be the owner of a certain Pierce Arrow automobile that was in controversy between the parties, also of some valuable books to which she made claim. An allowance of $5,000.00 was made for her counsel and all costs of suit were provided for. In these awards and allowances the court reduced by

one-half the amount which had been fixed by the commissioner as proper compensation to counsel for the plaintiff, and disallowed charges of certain non-resident attorneys for services rendered in connection with the taking of depositions beyond the state. The trial court also reduced from $35,000.00 to $15,000.00 the allowance in gross sum to the wife for the purchase of a home, and the alimony from $1,000.00 to $750.00 per month. On appeal to the Circuit Court of Cabell County the decree of the trial court was affirmed except that the allowance to the commissioner in chancery was reduced from $3,866.00 to $2,000.00. To the decree of the Circuit Court the defendant prosecutes this appeal. The plaintiff cross-assigns error in the reduction of the awards and allowances aforesaid.

It appears that although these parties were in very modest financial circumstances in the early years of their married life, they later came into affluence by reason of the great success and prosperity which attended the defendant's business enterprises and activities. This situation of fortune was augmented by the unusual conditions of business activity which attended the World War and the immediate aftermath. Some years ago the parties gave up their home in the City of Huntington and took an apartment in a hotel in that city where they lived until their separation in April, 1926. The plaintiff's explanation for this was that because of ill health she was not able to keep house.

The evidence does not convict the defendant of desertion or of cruel and inhuman treatment, except as the latter offense may be involved in adultery. The charge of adultery against the defendant, however, is fully sustained by the evidence. He had an affair with one Esther Watson Black, the co-respondent named in the plaintiff's bill. The intimate relations between the defendant and Mrs. Black seem to have existed for a year or more prior to the separation of the plaintiff and the defendant in April, 1926, and, in fact, up to the time and within the period of the pendency of this suit. There are in evidence a number of letters written by the defendant to Mrs. Black. These communications are replete with protestations of his love and affection for her.

There seems no room to doubt that the defendant and Mrs. Black were registered as Mr. and Mrs. A. J. Watson at Hotel Sinton, in Cincinnati, December 5, 1925, and occupied a bed room together. A similar episode, we are warranted by the evidence in believing, took place at the Ft. Hays Hotel, Columbus, May 12, 1925.

An instance of adulterous conduct on the part of the defendant subsequent to the institution of this suit involved an event at the Hotel Astor in the City of New York in the month of June, 1926. On the occasion in question the plaintiff, accompanied by a woman friend and two detectives, went to the Astor and found the defendant and Mrs. Black and another man engaged in a little drinking party in a bedroom. It is in evidence and not disputed that when Mrs. Edwards and her female companion and the two detectives entered the room under the circumstances just recited, the defendant said to his wife: ''Mae, I am damned glad you have caught me.'' The two detectives had followed Mr. Edwards from another hotel in the city to the Astor, and to room No. 506 and saw him enter this room, and then while one of the men went to get Mrs. Edwards and her woman companion, the other of the detectives stood watch and while so doing he observed the other male visitor enter the room. When Mrs. Edwards and her companions knocked on the door and were admitted to the room the bed had the appearance of having been occupied by two people. This was in the daytime. The hotel records disclosed that on that date this particular room was occupied by persons registered as C. M. Watts and wife. This registration was in the handwriting of the defendant.

This whole occurrence is set forth in full in allegations of plaintiff's second amended bill. The right to bring it into the record at all is challenged by the defendant. It is urged that allegations of adulterous conduct on the part of the defendant pending the suit are improper matters to be brought into the suit by amended bill or otherwise. This must be determined in the light of the fact that the defendant takes the position that if there were any acts of adultery on his part prior to the institution of this suit, they had been condoned by the plaintiff. The wife denies condonation. But

if there was condonation, the law would deem it to have been predicated on condition of subsequent good conduct on the part of the defendant. 9 R. C. L., p. 384. In that situation, it is proper that subsequent acts of adultery committed after the institution of the suit be pleaded and proved. It is an answer to condonation for adultery that there have been subsequent acts of violation of the marriage vows. In the case of *Lutz* v. *Lutz,* 52 N. J. Eq. 241, 28 Atl. Rep. 315, the court held that where condonation is interposed as a defense to an action for divorce on the ground of adultery, the plaintiff may file a supplemental bill or petition charging the defendant with acts of adultery subsequent to the alleged condonation, and subsequent to the commencement of the action. This is a general rule. Upon the same general considerations which control the practice in other proceedings, amendments are properly allowed in divorce suits, for the purpose of making the allegations of the pleadings more definite and certain, of asserting an essential allegation which has been omitted, or of including allegations of misconduct committed subsequent to the commencement of the suit. 9 R. C. L. 425-427; 19 C. J. 120; 1 Nelson on Divorce, 360. And, proof if acts committed after suit brought, when between the same parties, evidence of whose misconduct has already been introduced, is admissible for the purpose of showing adulterous disposition. 9 R. C. L. 326; 19 C. J. 129; *Taft* v. *Taft,* 80 Vt. 256, 12 Ann. Cas. 959. This court has recognized the right of a defendant in a divorce proceeding to bring into the cause by cross-bill acts of adultery of the plaintiff subsequent to the institution of the suit. *Roberts* v. *Roberts,* 99 W. Va. 204. In that case we quote with approval from *Von Bernuth* v. *Von Bernuth,* 76 N. J. Eq. 487, 139 A. S. R. 784, 74 Atl. 700, in part as follows: ''* * * this court having once rightfully obtained jurisdiction over the parties and the subject matter of the litigation, will proceed to hear the whole case, and measure out justice to the parties once for all on the facts alleged and proved.'' That principle should be applied in the instant case.

Though the defendant thus stands convicted of adulterous conduct, does it follow that the plaintiff is entitled as a mat-

ter of course to the relief which she seeks? That must be determined not alone by the defendant's guilt, but by the plaintiff's conduct as well. Let us examine the evidence bearing on the charges against her of inequitable and adulterous conduct. It is in evidence that during the latter years of their living together as husband and wife, this woman applied to her husband opprobious epithets so vile and indecent that they should not be carried into a judicial opinion. She admits this language in grave part. While it is true that these expressions were sometimes used by her in the heat of quarreling between herself and her husband, there were other instances where it is in evidence that she employed toward her husband this obscene and denunciatory language when he was not present, and there was no quarrel. She told the children of herself and the defendant that she had reason to believe that he was guilty of both house burning and murder.

Now as to the alleged adulterous conduct of plaintiff. The names of four or five men figure in this connection, but the evidence centers principally around James Stark, Harold Foster, and Earl Kelly.

First as to James Stark. It is in evidence that this young man visited at the New Hampshire summer home of the Edwardses in the absence of the defendant. Henry Poteet, who was employed by Mr. Edwards as a chauffeur, testified that while in the discharge of his duties with the family at the New Hampshire home, he and his wife slept a part of the time in the Edwards house, and that Stark was there. He says that Mrs. Edwards slept on a sleeping porch, to which access could be had only through her bed room, and that Stark at times occupied one of the three or four couch swings on the porch at the same time that Mrs. Edwards occupied another. He did not see them, but knew they were out there in the nighttime. He did not know how long this continued, because he was not at the house all the time. He says that Stark slept down stairs part of the time, and some times up stairs in the room next to the one occupied by him and his wife; but that he slept down stairs when the defendant was at the home. This witness says that his attention was called

to the situation by "Mrs. Edwards calling to Stark to come out on the porch, it was much cooler out there. She was on the porch then." Some effort is made to create the inference that Mrs. Edwards was calling to her son Jim, not to Jim Stark; but Poteet says he heard her "calling to Stark to come out." Dorothy Poteet, the chauffeur's wife, testified that she helped Mrs. Edwards make up the couch swings, and that two of them, side by side, had been occupied. She also says she had heard Mrs. Edwards and Jim Stark talking out there after bed time; and that Mrs. Edwards often went around with her bath robe and slippers on in the presence of Stark, which she did not do when other guests were at the home. Mrs. Edwards denies that Stark was on the sleeping porch with her at all; and she and two of her sisters say that the Starks did not room in the Edwards home, but stayed at a boarding house in the camp. But it does not appear that the sisters were there all the time. No effort is made to say who occupied the other bed on the porch; and Jimmie Edwards was not called to testify. Dorothy Poteet also says that Mrs. Edwards and Stark were left alone at the house when she and her husband went to Laconia for supplies, taking the two Edwards children with them.

Harold Foster, who appears to have been a resident of Philadelphia, was also a visitor at the Edwards home, in the absence of the defendant. Just what was the conduct between him and plaintiff does not appear, but it apparently was of such impropriety that the young daughter of plaintiff and defendant wrote her father accusing the mother of having a sweetheart at their home and that she could not stand such conduct in the house any longer. Defendant immediately went to New Hampshire; and he testifies that the daughter, in the presence of plaintiff, said she had seen her mother in the arms of Foster, who was kissing her, adding: "Father you have always taught me not to lie and mother you know that it is so." Defendant further testified that plaintiff accused the daughter of being an imbecile and having a crooked mind; but that he took the mother's word for it, and dismissed it, adding: "I had to do that or else take the child's statement and if I did, then I would have had to

leave." The daughter admits writing the letter, but says she had inherited a violent temper from both her father and mother, and was sorry she wrote the letter. She admits another guest at the home called her attention to the fact that her mother and Foster were occupying adjoining rooms, communicating through a bath room, and that she went into the mother's room and found the doors locked; but when asked if she found her mother in her room asleep at the time, she answered: "I am not going to answer any of those questions." She admits that during the conversation with her father and mother, when the matter was brought up, she said: "Mother, you have always taught me to tell the truth, and I am going to tell the truth." To excuse her attitude at the time she wrote the letter, she said she was pretty young and innocent, and had been kept more so than the average person, and that others would laugh at things she took seriously at the time; that her viewpoint had changed since then. Defendant also testified that the daughter told him she saw an interior decorator who was working at the home hold her mother in his arms and kiss her; and when questioned as to whether she had told her father this, she answered: "I don't recall that." She was then asked: "If you did tell him that, it was true, was it not?" Her answer was: "I don't recall telling him that." In regard to another incident the daughter testified as follows: "Q. Didn't you tell your father, also, that you saw your mother on the sofa in the sun parlor and she and Mr. Hays were kissing each other? What is the answer? A. No. Q. You didn't tell him that? A. No, as far as I know, I didn't tell him. Q. Well, if you did tell him, was it true? A. If I did; but, as far as I remember, I remember telling him no such thing. It happened a couple years ago. Q. If you did say that would you remember it now? A. It seems to me that I would. Q. Well, did you say anything of the kind? A. I told you I couldn't recall it." But nowhere does she deny the facts of plaintiff's alleged misconduct. This witness was twenty-two years of age at the time her testimony was taken, and had been married for more than a year. She seems to have been strongly disposed to shield her mother, and it is to be noted

that she was very forgetful of what took place at the time she wrote her father. Mrs. Edwards denies that there was any impropriety in her conduct with Foster or Stark, but it is not denied that they were guests at the New Hampshire home; and it appears that she wrote Foster, inviting him to visit there. It is further testified to by several of the employees of the Bellevue-Stratford Hotel in Philadelphia that Mrs. Edwards was seen in the company of Foster at the hotel on several occasions.

Earl Kelly seems to have figured in the life of Mrs. Edwards for several years. S. L. Brown, who was a friend and companion of Kelly's testified that about the year 1914 or 1915 he and Kelly visited the Edwards home on Third Avenue in the City of Huntington, in the absence of Mr. Edwards; that he went to the home to pay attention to a then unmarried sister of Mrs. Edwards, and that Kelly presumably went to see Mrs. Edwards, and spent the time talking with her, though the witness didn't see them make love to each other; that they didn't stay until an unreasonable hour at night—not later than around twelve o'clock; at times others were there, sometimes no one but Mrs. Edwards, her sister, and the two visitors. Witness admitted that ''we were kind of courting a little bit.'' He couldn't remember whether the four always stayed in the same room. When asked if he heard either Kelly or Mrs. Edwards say anything about corresponding with each other, he did not remember, but said one or the other told him they corresponded, how much he did not know, and never saw any of the letters. This witness testified that at one time when the Edwards family were living in Detroit, where one of defendant's factories was located, he and Kelly went to that city and stayed ''four or five, or five or six days.'' He knew of no reason for Kelly's being there except to see Mrs. Edwards. Defendant was not in the city at the time. The witness seems to have spent most of his time with Mrs. Edwards' sisters, and was out with them when Kelly was not along; but he was not sure where Kelly was at the time. When asked if he could tell from Kelly's actions who he was there to see, witness answered: ''Well, there was nobody there, as well as I remember, except Gladys and Sallie

and Mrs. Edwards, and I don't think he went to see Gladys or Sallie; it must have been Mrs. Edwards. That is a mere presumption." When questioned as to Mrs. Edwards' and Kelly's conduct or actions towards each other, Brown invariably answered: "I never saw them have their arms around each other;" or "Never saw them making love to each other;" or something to that effect. Counsel was unable to get him to describe their actions. Brown appears to have been a very unwilling witness, and could not remember many important and outstanding facts about which he was questioned. He admits going to Mr. Edwards or his counsel, and trying to get off from testifying.

It appears on cross-examination of Mrs. Edwards, that during the pendency of this suit she went from her home in Huntington to Cincinnati, where she purchased a railroad ticket to Toledo, took a train and made a continuous journey to Detroit, paying cash fare from Toledo to Detroit; that at Detroit she saw Kelly and talked with him; and that he said if she needed him as a witness, to call him. He was not called to testify; neither was Foster nor Stark.

There is another happening that should be noted. C. B. Brown, a resident of Huntington, testified that while a guest at the Waldorf-Astoria Hotel in New York, he found a note in his room asking why he didn't come to a certain room in the hotel, and saying: "We have a wonderful bar tender up here." Signed "The Mysterious Woman." He called the room by telephone, and was invited up. He recognized the voice as that of Mrs. Edwards. He and his nephew went to the room designated, and there, he says, they found Mrs. Edwards, her two sisters, and some other persons enjoying a gin fizz party. The defendant was not present.

Corroborative evidence and circumstances seem to sustain the defendant's assertion that for a number of years prior to the institution of this suit the plaintiff had absented herself from the defendant about forty per cent of the time. It was under such circumstances that defendant became interested in Mrs. Black.

What must we say about the conduct of this woman? God's noblest creation is a good woman. Her virtue is at the

summit of human attributes. The individual of her sex should enjoy the high position to which she is naturally entitled unless by her own misguided conduct she has forfeited her privilege. The trial court exculpated the plaintiff of the charge of adultery. Perhaps it did right. In any event we are not disposed to disturb the court's findings in that behalf. Let the mantle of charity be drawn about her and all doubts resolved in her favor, for "good name in man or woman * * * is the immediate jewel of their soul," and no wife should be pronounced a violator of her most solemn vows, unless upon evidence that will admit of no other conclusion. There must be convincing proof. *Schulte* v. *Schulte*, 90 W. Va. 787. But we cannot sustain the commissioner and the court in acquitting the plaintiff of all imputation of conduct which affects her remedial rights, for, at best, her conduct has been equitable and highly improper for any wife and mother. A complainant who has repeatedly applied to her husband unprintable epithets, who has said to her children for the obvious purpose of prejudicing them against their father that she has reason to believe him guilty of high crime, and who has time and again received the attentions of other men in the absence of her husband and under circumstances which afford ample cause to arouse suspicion of her marital fidelity, does not come into a court of equity in very good grace to seek relief against her erring husband. One of the foundation stones of equity is that "He who comes into equity must come with clean hands." This complainant does not meet that requirement. "* * * Whenever a party, who, as *actor*, seeks to set the judicial machinery in motion and obtain some remedy, has violated conscience, or good faith, or other equitable principle, in his prior conduct, then the doors of the court will be shut against him *in limine;* the court will refuse to interfere on his behalf, to acknowledge his right, or to award him any remedy." 1 Pom. Eq. Juris. (4th Ed.), sec. 397. This maxim applies in divorce cases as well as in other chancery procedure. *Maxwell* v. *Maxwell*, 69 W. Va. 414. And in harmony with this fundamental equitable doctrine is a settled principle of divorce procedure in this and other jurisdictions that im-

proper conduct of a plaintiff in such suit, though insufficient to afford basis for a divorce to the other spouse, may nevertheless preclude the plaintiff from obtaining the relief sought against the defendant. In *Murrin* v. *Murrin,* 94 W. Va. 605, the proposition is thus stated in point three of the syllabus: "Conduct of a wife proved in a suit brought by her for a limited divorce on the ground of cruelty, while not sufficient to warrant a divorce to her husband, may nevertheless be sufficient to preclude her from relief." In the case of *Hall* v. *Hall,* 69 W. Va. 175, JUDGE POFFENBARGER well said in the opinion: "Conduct sufficient to bar relief need not be such as would give the defendant cause for a divorce. Remedy and divorce are different things. Conduct sometimes denies remedy for apparent rights. Inequitable conduct on the part of the plaintiff, though it does not amount to cause for a divorce, suffices to defeat his application for relief." In *Hamilton* v. *Hamilton,* 87 W. Va. 534, the holding in the *Hall* case is approved and applied.

This principle ties back into the rule of the Ecclesiastical Courts of England, as later recognized by her courts of chancery, namely, that a wife or husband seeking divorce must come to the court free from matrimonial misconduct. *Otway* v. *Otway,* Probate Division, Court of Appeal, Vol. XIII, p. 141, and cases there cited. We are not unmindful of the holdings that the misconduct on the part of a plaintiff in a divorce suit, separate and distinct from that charged against the defendant and having no relation to it, cannot be set up as a bar to relief of the plaintiff, unless it constitutes ground for divorce. *Cushman* v. *Cushman,* (Mass.), 79 N. E. 809. But that principle is not controlling here, in the first place, because we are not able to say that the plaintiff's gross misconduct, though in no sense justifying defendant's misconduct, was entirely separate and distinct therefrom, or may not have had powerful bearing thereon; and, secondly, because the rigidity of that holding has been relaxed by the rule which has been adopted by this Court in the above cited cases. See also: *Lyster* v. *Lyster,* 111 Mass. 327; *Gill* v. *Gill,* (Mich.), 181 N. W. 996; *Goeldner* v. *Goeldner,* (Iowa), 139 N. W. 889; *Wiley* v. *Wiley,* (Iowa), 151 N. W. 205.

Weighing the plaintiff's conduct in the light of the above principle, we hold that she is not entitled to the relief for which she prays against the defendant. The revised allowances to the commissioner and counsel we approve. The gross sum allowed to the wife and the monthly alimony fall with the decree. We, therefore, reverse the decree save only in the matters of allowances to the plaintiff's local counsel and for costs and expenses of suit. Equity will thus leave the parties as it found them. The common law and statutory duty of maintenance of his wife remains with the defendant. The courts will be open to her in that behalf if necessary.

*Reversed in part; affirmed in part.*