SARAH MOSS *v.* J. E. MOSS

(No. 7201)

Submitted October 12, 1932. Decided December 12, 1932.

184

*J. M. Ritz*, and *Robert Burnett*, for appellant.

*Riley & Riley*, for appellee.

LITZ, JUDGE:

The bill of Sarah Moss, filed at May Rules, 1928, against her husband, J. E. Moss, for divorce from bed and board, alimony, and custody of their children, alleges that plaintiff and defendant were married September 15, 1914, and have resided in the city of Wheeling for the last five years; that five sons, born of the marriage, are twelve, ten, eight, six and four years of age, respectively; that defendant, without cause, deserted his home and family January 13, 1928; that frequently during their married life defendant has beaten, abused, struck and severely injured plaintiff, thereby causing her great pain, anguish and humiliation; that at various times since their marriage, he has, without cause, called plaintiff vile and abusive names; that defendant has constantly kept intoxicating liquors in the home since the marriage, becoming addicted to the use thereof in excessive quantities; that he has exhibited little, if any, affection for his children, and has directed the greater part of his attention to his business affairs; that plaintiff, on the contrary, has been a loving mother to the children, carefully observing their physical, mental and spiritual development, and by reason thereof is loved and respected by them; that defendant, on account of his improper conduct and lack of interest in their welfare, is unfit to have their custody; that he is possessed of means adequate to support her and the children at the standard of living to which they have become accustomed. The bill prays that plaintiff be granted a divorce from bed and board, the custody of the children, suit money and alimony; and that defendant be enjoined from further prosecuting a suit instituted by him against her for an absolute divorce. Plaintiff filed an amended bill May 2, 1928, alleging that defendant was fraudulently attempting to convey, without consideration, all of his real and personal property for the purpose of defeating any decree in her favor for alimony, and suit money; and praying for the appointment of a receiver to take charge of his estate pending the litigation.

May 2, 1928, defendant filed a petition asking for the custody of the children pending the suit; and in a supplemental petition, filed May 10, 1928, praying for the same relief, he alleged that plaintiff is not a fit and proper person to have their custody; that she has been guilty of adulterous conduct with one Harry Hogan at the Moss home, in May, 1927, at Steubenville, Ohio, May 6, 1927, at Wildwood, New Jersey, May 29, 1927, and at Atlantic City, New Jersey, May 30, 1927; that plaintiff has frequently conducted herself in an improper and immoral manner before the servants and tradesmen about the home; that for several years prior to the separation, she had indulged to excess in the use of intoxicating liquors in the home and has appeared intoxicated on the streets of Wheeling; and that she is accustomed to use profane, obscene and indecent language in and about the home, in the presence of the children. May 22, 1928, plaintiff filed an answer to the supplemental petition of defendant, denying the acts of improper conduct therein against her, and charging defendant with indecent and improper conduct before the servants and children, and adultery with an unnamed woman. On July 6, 1928, after hearing testimony on the issues, the court entered a decree, awarding plaintiff temporary custody of the children subject to the privilege of defendant to visit them weekly; directing him to pay her, at that time, $1,000.00 for attorney's fee, $100.00 court costs, $1,200.00 for maintenance of herself and the children, and $700.00 per month for that purpose thereafter until final decree; and enjoining defendant from conveying or encumbering his property. September 1, 1928, defendant filed an answer in the nature of a cross-bill to the original and amended bills, containing charges similar to those in his supplemental petition, and praying for an absolute divorce and custody of the children. November 14, 1928, a decree was entered, increasing the monthly allowance to $900.00, and fixing December 14, 1928, for final hearing of the cause. Thereafter, the hearing was continued at the instance of plaintiff, to January 15, 1929. Upon consideration of voluminous evidence in behalf of each party, the trial chancellor filed a memorandum, March 26, 1929, stating: ''Upon final hearing. There is no escape from the conclusion that the plaintiff committed adultery with Harry Hogan, at the Adel-

phi-Witte Hotel, at Wildwood, N. J. Under the evidence the defendant is entitled to a decree upon his cross-bill. The great difficulty is to know what to do with the children. This perplexing problem is not susceptible of a solution which is entirely satisfactory. In view of all the circumstances, the best that can be done is to award the custody of the children to the defendant, and require a proper and sufficient bond from him for their maintenance and support. Suitable provision should be made whereby the plaintiff may visit the children. A decree may be entered accordingly." On August 3, 1929, after the taking of further proof, upon motion of plaintiff for a rehearing, wherein she charged defendant with adulterous conduct with one Marian Curley, the court filed a second memorandum, reading: "I am unable to reach any conclusion on this question different from the one heretofore announced." December 29, 1930, a third memorandum was filed, as follows: "I see no sufficient reason for changing the conclusion heretofore reached in this case." On April 17, 1931, a final decree was entered, granting defendant an absolute divorce and the custody of the children, subject to the privilege of plaintiff to visit them at all proper times, and to their being kept within the jurisdiction of the court; rendering judgment in her favor against him in the sum of $21,740.00 as accumulated temporary alimony; directing him to pay her attorneys $1,000.00 for services in the cause from January 3, 1929, and $1,000.00 for the prosecution of an appeal from the decree on her behalf, and to pay the clerk of the circuit court $2,000.00 for costs of transcript and printing of record, and other expenses incident to the appeal; requiring him to execute a $5,000.00 bond to guarantee the presence of the children at all times within the jurisdiction of the court; and providing that the decree shall not become effective until he has complied with its requirements.

The evidence as to alleged improper relations between defendant and Marian Curley, taken from time to time, follows: *December* 28, 1928. Homer Mead, credit manager for C. C. Mellor Company, Pittsburgh, Pa., testifying from the records of his company, stated that during December, 1926, J. E. Moss, Wheeling, West Virginia, purchased from the company an orthophonic victrola, No. 2918, costing $270.00, and twenty-

four victrola records. Peter Wack, drayman for C. C. Mellor Company, testifying from delivery receipts of the company, stated that after delivering a victrola, No. 2918, to room 307 at the William Penn Hotel, he was instructed a few days later to remove it for J. E. Moss to Miss Curley's address at 500 East End Avenue, where it was accepted by an elderly woman, who signed the delivery receipt as Marian Keck.

*January* 17, 1929. Mrs. Esther Wilson, a personal friend of Marian Curley, testified that Miss Curley showed her a diamond bracelet and two silk sleeping garments in April or May, 1928, stating that defendant had given them to her; and that Marian Keck is the mother of Marian Curley. Mrs. S. Paul Mahoney, who lives on the first floor of the Hugus Apartments in Pittsburgh, testified that Miss Curley maintained an apartment on the third floor of the building in 1927; that during the summer of that year she saw defendant, usually on Saturday afternoons (sometimes accompanied by Miss Curley) enter the apartment house at least six times; and that on one occasion she personally opened the main door for him. Herman Klein, superintendent of Hugus Apartments, testified that he had seen defendant come out of Miss Curley's apartment perhaps three times between eight-thirty and nine A. M. Defendant, testifying in his own behalf, denied giving Miss Curley the diamond bracelet and the sleeping garments, or that he had ever seen Mrs. Mahoney, but "thought" he had been admitted to the apartment by the janitor "on the occasion I went there"; and asserted that during the summer of 1927, he spent every Saturday afternoon at home playing golf with friends. He made no further denial nor offered any explanation, in his testimony, of his acquaintance with Miss Curley.

*October* 19, 1929. R. R. Kitchen testified that he and defendant spent the night of December 23, 1927, at the William Penn Hotel in Pittsburgh; that on the following morning he and C. W. Bates went to an apartment in East Pittsburgh at ten o'clock in response to a telephone call from defendant, who had left the hotel two hours before; that upon being admitted to the apartment by Marian Curley, they found defendant (alone with her) lying on a bed partially dressed and covered with a blanket, complaining of tonsilitis; that Miss Curley had been doing advertising work for a company in

which defendant was interested; that Bates telephoned a doctor, who advised that defendant be kept quiet; that he and Bates took defendant to the hotel just before noon; and that early in the afternoon they left with him by automobile for Wheeling. Kitchen is substantially corroborated by Bates. Defendant did not testify in explanation of this or any other of his visits with Marian Curley or of his apparent gift to her of a costly victrola. He did, however, May 23, 1928, before having been charged with improper relations with Miss Curley, deny that he had ever committed the act of adultery. This evidence is not sufficient to prove the charge of adultery against him.

The evidence of adulterous conduct of plaintiff with Harry Hogan being, in our opinion, sufficient to warrant the finding of the chancellor, its narration will serve no useful purpose.

It is contended that defendant's relations with Marian Curley, though not amounting to adultery, constitute such inequitable conduct on his part as to bar his right of divorce on the ground of adultery of plaintiff. The cases of *Hall* v. *Hall,* 69 W. Va. 175, 71 S. E. 103; *Maxwell* v. *Maxwell,* 69 W. Va. 414, 71 S. E. 571; *Hamilton* v. *Hamilton,* 87 W. Va. 534, 105 S. E. 771; *Murrin* v. *Murrin,* 94 W. Va. 605, 119 S. E. 812, and *Edwards* v. *Edwards,* 106 W. Va. 446, 145 S. E. 813, 817, are cited in support of this defense. In each of the first four cases, the plaintiff, seeking a divorce for alleged cruelty or desertion, was denied relief because of his or her inequitable conduct toward the defendant provocative of the alleged cause for divorce. In the last case, it was held that the conduct of the plaintiff wife in absenting herself from the defendant approximately forty per cent of the time, her use of vile and abusive language toward him in the presence of their children and her relations with other men arousing suspicion of marital infidelity constituted such inequitable conduct as to defeat her application for divorce on the ground of notorious acts of adultery on his part. In the opinion of the case it is stated: "We are not able to say that the plaintiff's gross misconduct, though in no sense justifying defendant's misconduct, was entirely separate and distinct therefrom, or may not have had powerful bearing thereon." It will be observed upon investigation that there is no other West Virginia case holding that the misconduct on the part of one spouse, short of adultery.

will bar the right of the other to a divorce on the ground of adultery. In Bishop On Marriage, Divorce, and Separation, (Vol. 2) sec. 387, the doctrine is discussed, as follows: ''Judicial dicta in the ecclesiastical courts established, as far as dicta alone could, that to prove recriminatory adultery such strong facts are not necessary as to convict in a direct proceeding for divorce. The reason assigned was that the one who brings into court a criminal imputation on the other must purge his own conduct of all reasonable imputation of the same sort. If by this we are to understand that the plaintiff must affirmatively satisfy the tribunal of his own innocence,—as, by such evidence of good character as renders his adultery improbable,— we have States in which the like practice prevails. But neither in principle nor by the common course in most of our States is this the true practice; the defendant must allege and prove the adultery he relies on in bar. Returning to the ecclesiastical courts, though we find in one of the cases observations to the effect that solicitations of chastity short of the very act were deemed sufficient in recrimination, this in another was doubted. And it was the clear doctrine of those courts that a defendant who sets up the plaintiff's adultery must prove it, to make good his bar. Since a plaintiff who relies on the defendant's adultery is obliged to do no more than prove his case, there would appear to be little scope for this distinction. In the Divorce Court in England, this distinction seems to be utterly discarded. In this country, the writer, who has read all the reported divorce cases, is unable to recall any one in which such a distinction was admitted. The New York Court has discarded it, holding that no less evidence is required to prove recriminatory adultery than any other. It is not probable that the English ecclesiastical doctrine would now be accepted in any State wherein the burden of proof to establish the recriminatory charge is held to be on the defendant.''

It seems that the defense of ''inequitable conduct'' to an application for divorce on the ground of adultery, has been confined to a few cases extending the privilege to the wife and requiring that the conduct ''must ordinarily be such as amounts to a breach of marital duty on the part of the husband, and such that the wife's adultery was the natural and probable consequence of it.'' 19 C. J. 78.

Basing the ruling in the *Edwards* case upon the peculiar facts as establishing an aggravated instance of inequitable conduct on the part of the complaining spouse, which may have had some causal relation with the adultery of the other, we do not think the evidence of misconduct by Moss, which did not come to the attention of his wife until after their separation, would justify the further extension of the unclean hands doctrine in divorce suits. We therefore affirm the trial chancellor's action in awarding a divorce to the defendant.

Defendant complains of the conditions of the decree, contending (1) that the temporary alimony was terminated upon filing of the first memorandum of the court, which, he insists, amounted to an adjudication, (2) that the conditions imposed in awarding him custody of the children are unauthorized by law, and (3) that the allowances for attorneys and costs of appeal are excessive.

As the circuit court should have promptly entered a decree upon the memorandum of March 26, 1929, we are of opinion to set aside the judgment for accrued installments of alimony and remand the cause for readjustment thereof, in the light of the expenses incurred by plaintiff, reasonably necessary for the support of herself and children; notwithstanding the general rule that temporary alimony continues, in the discretion of the court, until the entry of the judgment or decree granting or denying the relief asked, although the issues were found against the wife.

Now as to the children. As already stated, the trial chancellor awarded their custody to defendant conditioned upon bond to keep them within the state. We set aside that finding inasmuch as considerable time has since elapsed and conditions with respect to the children may have changed.

The chancellor should therefore enter such order determinative of the custody of the children as existing conditions may indicate is for their best interests.

We reverse the decree in so far as it fixes specific amounts for costs, and direct the entry of a decree for costs and other expenses actually incurred.

It is stated in the reply brief of defendant's counsel that attorneys for plaintiff have received $5,250.00 for services in

the trial court, and $1,000.00 for services on this appeal. In view of these payments, we reverse the decree in so far also as it awards additional counsel fees, in order that such allowance may be reduced in the light of all the circumstances.

The decree is accordingly affirmed in part, reversed in part, and the cause remanded.

*Affirmed in part; reversed in part; remanded.*